# No. 14-55129

## In the United States Court of Appeals
## For The Ninth Circuit

---

## MARIA de LOS ANGELES AURORA GOMEZ, et al.,

Plaintiffs and Appellants,

v.

## BANK OF AMERICA, N.A., et al.,

Defendants and Appellees.

---

# APPELLEES' ANSWER BRIEF

---

Appeal From Judgment After Order Granting Motion To Dismiss With Prejudice
United States District Court for the Central District of California
Case No. CV 12-8704-GHK (SHx)
Honorable George H. King, Chief District Judge

---

Paul D. Fogel
pfogel@reedsmith.com
Marc A. Lackner
mlackner@reedsmith.com
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-365
Telephone: 415 543-8700
Facsimile: 415 391-8269

Peter J. Kennedy
pkennedy@reedsmith.com
Paula M. Mitchell
pmitchell@reedsmith.com
Mathew Wrenshall
mwrenshall@reedsmith.com
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071-1514
Telephone: 213 457-8000
Facsimile: 213 457-8080

Attorneys for Defendants and Appellees
*Bank of America, N.A., et al.*

## CORPORATE DISCLOSURE STATEMENT

Bank of America, N.A., is a United States corporation for itself and as successor in interest for Countrywide Bank, FSB, formerly known as Countrywide Bank N.A., et al.

Bank of America, N.A. is a wholly-owned subsidiary of Bank of America Corporation. Bank of America Corporation does not have a parent corporation and no publicly traded corporation owns ten percent or more of the stock in Bank of America Corporation.

DATED: April 28, 2015.

REED SMITH LLP

By  */s/ Paula M. Mitchell*
    Paula M. Mitchell

Attorneys for Defendants and
Appellees *Bank of America, N.A., et al.*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................1

II.   STATEMENT OF JURISDICTION ............................5

III.  COUNTERSTATEMENT OF THE ISSUES...................6

IV.  STATEMENT OF FACTS AND PROCEDURAL HISTORY...............................................................7

    A.    Vahedi's Mortgage Fraud Scheme Lures Unsuspecting Homeowners Into Applying For Loans They Cannot Afford ................................8

    B.    Vahedi's Ponzi Scheme Defrauds His Unsuspecting Friends And Clients Of Millions Of Dollars ........................................9

    C.    Vahedi Pleads Guilty To Major Fraud Schemes And Is Sentenced To Eighteen Years In Federal Prison........................................ 10

    D.    Plaintiffs File A 185-Page Complaint Alleging That The Bank Defendants Are Liable For Their Ponzi Scheme Losses ............................ 11

        1.    Plaintiffs Allege That They Invested Millions Of Dollars In What Vahedi Described As No Risk, High Yield Investment Opportunities.......................... 11

            a.  Borrower-Investor Plaintiffs ................. 12

            b.  Borrower Plaintiffs ............................. 18

**TABLE OF CONTENTS**
**(CONTINUED)**

**Page**

        c.  Non-Borrower Plaintiffs ....................... 21

    2.  Plaintiffs Allege RICO Claims Against The Bank Defendants .............................. 23

    3.  The Bank Defendants Move To Dismiss The Complaint For Failure To State A Claim ................................................. 27

    4.  The District Court Dismisses Plaintiffs' Complaint With Leave To Amend ............... 29

  E.  Plaintiffs File A 253-Page First Amended Complaint, Adding Fifty Pages Of "New" Allegations .................................................. 31

    1.  The Bank Defendants Move To Dismiss Plaintiffs' FAC, Without Leave To Amend, For Failure To State A Claim .......... 34

    2.  The District Court Grants Defendants' Motion To Dismiss Plaintiffs' RICO Claims, With Prejudice, And Declines To Exercise Jurisdiction Over The Pendant State Claims .............................. 36

V.    STANDARD OF REVIEW ....................................... 41

VI.   SUMMARY OF ARGUMENT .................................. 43

VII.  ARGUMENT ...................................................... 46

  A.  Plaintiffs' FAC Failed To State A Claim For Violation Of RICO § 1962(a) or (b) ................... 46

## TABLE OF CONTENTS
## (CONTINUED)

**Page**

B.   Plaintiffs Failed to State A § 1962(c) Claim
     Against The Bank Defendants Because They
     Did Not Plausibly Allege Facts Giving Rise
     To RICO Standing Under § 1964(c) ..................... 48

     1.   Plaintiffs' Misplaced Trust In Vahedi
          And His Decision Not To Repay Their
          Loans Were The But-For And
          Proximate Causes Of Their Losses ............... 49

     2.   The Bank Defendants Did Not
          Proximately Cause Plaintiffs' Injuries
          By Virtue Of Any Alleged Fiduciary
          Duty Because No Such Duty Existed ............ 53

     3.   Equitable Tolling Does Not Apply To
          Save The Mortgage Fraud Claims From
          RICO's Four-Year Statute Of
          Limitations ......................................... 55

C.   Because The District Court Dismissed
     Plaintiffs' Underlying RICO Claims, It
     Properly Dismissed Plaintiffs' § 1962(d)
     RICO Conspiracy Claim .................................. 56

D.   The District Court Properly Dismissed
     Plaintiffs' RICO Claims Without Leave To
     Amend ..................................................... 57

VIII. CONCLUSION .................................................... 58

STATEMENT OF RELATED CASES ............................... 59

**TABLE OF CONTENTS**
**(CONTINUED)**

**Page**

CERTIFICATION OF COMPLIANCE.............................. 60

CERTIFICATE OF SERVICE........................................ 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ……………………………………42, 43, 49, 53

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) …………………………………… 36, 41, 43

*Beck v. Prupis*,
  529 U.S. 494 (2000) ……………………………………………… 56

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) …………………………………… 36, 41, 43

*Benson v. JPMorgan Chase Bank, N.A.*,
  2010 WL 1526394 (N.D. Cal. 2010) ………………………… 51

*Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466 (9th Cir. 1987) ……………… 54

*Canyon County v. Syngenta Seeds, Inc.*,
  519 F.3d 969 (9th Cir. 2008)………………………………… 49

*Casualty Ins. Co. v. Rees Inv. Co.*,
  14 Cal.App.3d 716 (1971) …………………………………… 55

*Chodos v. West Publ'g Co.*,
  292 F.3d 992 (9th Cir. 2002)………………………………… 57

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*,
  751 F. 3d 990 (9th Cir. 2014)……………………………… 41, 42

*Eller v. EquiTrust Life Ins. Co.*,
  778 F.3d 1089 (9th Cir. 2015) ……………………………… 53

## TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

*Gonzales v. Lloyds TSB Bank, PLC*,
532 F. Supp.2d 1200 (C.D. Cal. 2006)........................ 51, 52

*Hemi Group, LLC v. City of New York, N.Y.*,
559 U.S. 1 (2010) .................................................... 49

*Holmes v. Sec. Investor Prot. Corp.*,
503 U.S. 258 (1992) .............................................*passim*

*Imagineering, Inc. v. Kiewit Pacific Co.*,
976 F.2d 1303 (9th Cir. 1992) ...................................... 51

*Krainski v. Nevada ex rel. Bd. of Regents of NV. System of
Higher Educ.*, 616 F.3d 963 (9th Cir. 2010) ...................... 43

*Maio v. Aetna, Inc.*,
221 F.3d 472 (3d Cir. 2000) ...................................... 42

*Mendoza v. Zirkle Fruit Co.*,
301 F.3d 1163 (9th Cir. 2002) .................................... 52

*Moss v. U.S. Secret Serv.*,
572 F.3d 962 (9th Cir. 2009)...................................... 41

*Nat'l Audubon Soc'y*,
307 F.3d 835 (9th Cir. 2002)...................................... 57

*Nugget Hydroelectric, L.P. v. Pacific Gas and Elec. Co.*,
981 F.2d 429 (9th Cir. 1992).................................. 46, 47

*Nymark v. Heart Fed. Sav. & Loan Assn.*,
231 Cal. App. 3d 1089 (1991) ..................................... 54

*Oaks Mgmt. Corp. v. Superior Court*,
145 Cal. App. 4th 453 (2006) ..................................... 55

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007).................................. 41, 47

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Oscar v. University Students Co–operative Ass'n*,
965 F.2d 783 (9th Cir. 1992) (en banc) ...................... 42, 43

*Rezner v. Bayerische Hypo–Und Vereinsbank AG*,
630 F.3d 866 (9th Cir. 2010)......................................... 49

*Sea-Land Serv., Inc. v. Atlantic Pacific Int'l*,
57 F. Supp. 2d 1048 (D. Hawai'i 1999)........................... 47

*Sebastian Intern., Inc. v. Russolilo*,
186 F. Supp. 2d 1055 (C.D. Cal. 2000)........................... 47

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
473 U.S. 479 (1985) ................................................... 49

*Sybersound Records, Inc. v. UAV Corp.*,
517 F.3d 1137 (9th 2008) ......................................... 52, 53

*United States v. Benny*,
786 F.2d 1410 (9th Cir. 1986) ....................................... 53

*United States v. Corinthian Colleges*,
655 F.3d 984 (9th Cir. 2011)..................................... 42, 58

*W. Mining Council v. Watt*,
643 F.2d 618 (9th Cir. 1981)......................................... 41

*Wagh v. Metris Direct, Inc.*,
348 F.3d 1102 (9th Cir. 2003) ............................. 47, 48, 56

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

**Statutes**

18 U.S.C.
    § 371 ……………………………………………… 10
    § 1343 ……………………………………………… 10
    § 1344 ……………………………………………… 11
    § 1962(a) …………………………………………… *passim*
    § 1962(a)-(d) ……………………………………… 5, 6
    § 1962(b) …………………………………………… *passim*
    § 1962(c) …………………………………………… *passim*
    § 1962(d) …………………………………………… *passim*
    § 1964(c) …………………………………………… *passim*

28 U.S.C.
    § 1291 ……………………………………………… 5
    § 1331 ……………………………………………… 5
    § 1367(c)(3) ………………………………………… 31

**Rules**

Fed. R. Civ. P.
    8(a) ………………………………………………… 41
    9(b) ………………………………………………… 41
    12(b)(6) …………………………………………… *passim*

**Other**

J. Rakoff, RICO: Civil and Criminal Law Strategy
    § 1.06 (Lexis 2013) ……………………………… 47

# I.

## INTRODUCTION

The seventeen individual plaintiffs here invested millions of dollars in a Ponzi scheme orchestrated by Kaveh Vahedi, who plaintiffs knew and considered a friend. But Vahedi was no friend. He was a cunning confidence man posing as a successful business man, who convinced over 30 investors, including plaintiffs, to invest more than $11 million in what he claimed were risk-free, high yield investments.

Vahedi used his position as an independent mortgage broker to obtain home equity loans for some of the plaintiffs, often falsely exaggerating the borrowers' assets, income or both on loan applications to obtain larger loans. Vahedi convinced plaintiffs to invest both the loan proceeds and funds from other sources in his Ponzi scheme. He used money from newer investors to pay prior investors until the scheme collapsed in Fall 2008. Vahedi ultimately pled guilty in federal court to three criminal fraud schemes, including mortgage fraud and investment fraud, and was sentenced to eighteen years in prison and ordered to pay more than $9 million in restitution to his victims. Apparently unable to recover the funds they invested from Vahedi, plaintiffs sought to hold Bank of America, N.A. (for itself and as successor to Countrywide Bank FSB), and Countrywide Home Loans, Inc. dba America's Wholesale Lender ("Bank Defendants") responsible for Vahedi's wrongdoing.

Plaintiffs did not allege in their complaint that the Bank Defendants were aware of Vahedi's Ponzi scheme, or even that the Bank Defendants were in any way directly responsible for their decision to invest in Vahedi's scheme.

Instead, plaintiffs' theory was that the Bank Defendants were liable for their losses because Countrywide included Vahedi—who was at the time an independent mortgage broker—on a list of its "business partners" in certain promotional materials. Plaintiffs contended that when Countrywide accepted loan applications that Vahedi submitted, and in some cases funded the applied-for loans, the Bank Defendants violated the Racketeering Influenced and Corrupt Organizations ("RICO") Act because in so doing they gave Vahedi an imprimatur of legitimacy, which enabled him to perpetrate his frauds.

The district court rejected that theory, twice. It dismissed the RICO claims in plaintiffs' original complaint, without prejudice, because plaintiffs failed to establish RICO standing. Specifically, plaintiffs failed plausibly to allege that the Bank Defendants' actions *directly caused* their investment losses. The district court also concluded that as a lender, Countrywide did not owe plaintiffs a fiduciary duty to unmask Vahedi's Ponzi scheme. Nor were the Bank Defendants liable for Vahedi's Ponzi scheme by virtue of any agency theory plaintiffs advanced.

Plaintiffs filed a First Amended Complaint ("FAC"), adding more than fifty pages of new allegations in an attempt to

support their RICO claim. But those allegations did not cure the deficiencies the district court identified in its first dismissal order. None of the new allegations changed the district court's initial causation analysis, or plausibly alleged RICO standing. Thus, the district court granted the Bank Defendants' motion to dismiss the FAC, this time *with* prejudice. As the allegations in plaintiffs' FAC made clear, the direct cause of plaintiffs' investment losses was their misplaced trust in Vahedi, his fraudulent misrepresentations to them—which plaintiffs admit induced them to invest in his Ponzi scheme—and his decision not to repay them; the Bank Defendants' conduct did not cause their losses.

Additionally, plaintiffs' FAC failed plausibly to allege that any representations by Countrywide stating that Vahedi was its business partner materially contributed to their decision to invest with him. Plaintiffs also failed plausibly to allege that Vahedi was Countrywide's agent, particularly given that a mortgage broker is generally the *borrower*'s (here plaintiffs') agent, not the lender's. The FAC also failed plausibly to allege that the Bank Defendants owed plaintiffs a fiduciary duty. Indeed, there was no basis for thirteen of the seventeen plaintiffs—who invested funds wholly unrelated to any transactions with the Bank Defendants—to allege the existence of a fiduciary relationship. Nor was there a fiduciary relationship between the Bank Defendants and the four plaintiffs who invested funds purportedly obtained through loan transactions Vahedi brokered—the "borrower-investor plaintiffs." Those transactions were at arm's length, Countrywide had only minimal contact with those plaintiffs,

and, absent special circumstances not present here, there is no fiduciary relationship between a lender and a borrower.

The district court also rejected the four borrower-investor plaintiffs' claim that Bank Defendants were liable for their damages under a "fraudulent mortgages" theory as time-barred under RICO's four-year statute of limitations because those plaintiffs failed to show they were reasonably diligent in seeking loan documents, which would have put them on notice of the fraud. Because plaintiffs failed to allege an underlying RICO claim, the district court also dismissed their RICO conspiracy cause of action, declined to exercise jurisdiction over plaintiffs' pendant state law claims, and dismissed those claims without prejudice.

On appeal, plaintiffs assert the same attenuated causation arguments they raised in the district court. That is they claim the Bank Defendants are directly liable for their losses under RICO because the Bank Defendants gave Vahedi an imprimatur of legitimacy by representing that he was a "business partner" and that the Bank Defendants owed them fiduciary duties. Plaintiffs argue that the district court's RICO standing and causation analyses reached the wrong result, but they do not identify any legal error in the district court's decision or point to any relevant legal authorities supporting that claim.

Plaintiffs also claim the Bank Defendants are liable for a RICO conspiracy because Vahedi was the Bank Defendants' agent and

his acts were thus imputed to them. They also claim the Bank Defendants conspired with Vahedi because they "probably" knew of his Ponzi scheme, or were "willfully blind" to it, which, plaintiffs argue, is "equivalent to actual knowledge" for purposes of their RICO conspiracy claim. These are not correct statements of the law. Because the district court's analysis was sound in all respects, this Court should affirm the judgment.

Because the issues plaintiffs raise in their Opening Brief rest on settled legal principles, the Bank Defendants do not believe oral argument is necessary to affirm. If the Court is inclined to schedule oral argument, defendants submit that ten minutes per side would be adequate.

## II.

## STATEMENT OF JURISDICTION

The district court had federal question jurisdiction under 28 U.S.C. § 1331 over plaintiffs' causes of action based on defendants' purported violations of RICO, 18 U.S.C. § 1962(a)-(d). This Court has jurisdiction under 28 U.S.C. § 1291 over the district court's judgment entered after a final order granting defendants' Rule 12(b)(6) motion to dismiss.

# III.

## COUNTERSTATEMENT OF THE ISSUES

1.     Whether plaintiffs' FAC failed to state a claim upon which relief can be granted for violation of the RICO Act, § 1962(a)-(d), where:

(a) plaintiffs failed to allege any conduct by the Bank Defendants that would constitute a violation of § 1962(a) or (b); and,

(b) plaintiffs failed to state a claim under § 1962(c) because they did not plausibly allege facts giving rise to statutory RICO standing, i.e., that the Bank Defendants' predicate acts of racketeering directly caused their alleged injuries; and,

(c) based on plaintiffs' failure to state a claim that the Bank Defendants committed any predicate acts of racketeering under § 1962(a), (b), and (c), the district court dismissed plaintiffs' RICO conspiracy cause of action under § 1962(d).

2.     Whether the district court abused its discretion when it denied plaintiffs leave to amend their complaint, where plaintiffs failed to cure in their FAC the deficiencies the district court

identified in their original Complaint, despite having added fifty pages of "new" allegations.

## IV.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Over an almost ten-year period, Kaveh G. Vahedi systematically defrauded banks and carried out a Ponzi scheme that robbed more than thirty families of their life savings, "including his own parents." ER/52. Vahedi ran his schemes through KGV Investments, Inc., a mortgage lending and brokerage firm of which he was the sole owner and operator. ER/78. KGV Investments, Inc., also operated under the name *County*wide Financial, which is in no way related to *Country*wide, or any of the Bank Defendants, despite the similarity of the names. ER/78, 357. Vahedi is not a party to this suit but the serious fraud schemes he orchestrated and perpetrated, and for which he has been convicted and sentenced to eighteen years in federal prison, were responsible for plaintiffs' alleged injuries. ER/59, Ex. B to RJN at 1.[1]

---

[1]     With this brief, the Bank Defendants are filing an opposition to plaintiffs' RJN, except as to Exhibit B, which appears to be a public record relating to Vahedi's criminal proceeding. *See* Exh. B to Appellants' RJN [Doc. 27-1], "Judgment and Probation/Commitment Order." *United States v. Vahedi*, Case No. CR 12-00380 DDP.

**A.   Vahedi's Mortgage Fraud Scheme Lures Unsuspecting Homeowners Into Applying For Loans They Cannot Afford**

As set forth in Vahedi's plea agreement with the government, between September 1999 and March 2008, he conspired with a loan processor at his own *County*wide Financial and another, who operated a bookkeeping and tax services business, to knowingly make false statements on at least 250 mortgage loan applications to federally-insured banks, including the Bank Defendants.  ER/52, 357-59.

Vahedi's scheme was to have his homeowner clients, who could not qualify for new loans, sign blank loan application forms which Vahedi would complete, or direct others to complete, by including materially false information about the borrowers' employment, income, and assets, among other things.  ER/52, 358. On behalf of borrowers, Vahedi then submitted the fraudulent loan applications to Countrywide Home Loans, Countrywide Bank, Bank of America, and other lenders, which approved the loans based on the false information Vahedi provided.  The banks then wired millions of dollars in loan proceeds to Vahedi's client-borrowers via the title companies involved in the loan transactions.  ER/359.  In some cases, Vahedi persuaded his client-borrowers to invest the proceeds of the fraudulent loans in his company, KGV Investments, by telling them that the loans were "no risk" because he would "guarantee the principal would come back to [them] plus a sizable return monthly." ER/478, 502.

**B.    Vahedi's Ponzi Scheme Defrauds His Unsuspecting Friends And Clients Of Millions Of Dollars**

As stated in Vahedi's plea agreement, between 2005 and 2009, Vahedi was simultaneously running a major scheme to defraud investors in KGV Investments through what was essentially a classic Ponzi scheme.  ER/361.  Vahedi solicited investors (in addition to his client-borrowers) by telling them that KGV Investments was a successful real estate company capable of generating large profits from commercial real estate projects in the United States and overseas, including projects in San Diego, China, and Dubai.  *Id.*  As security for the funds invested, Vahedi "provided investors with promissory notes that guaranteed high rates of return, typically a fifty percent return within nine months of the initial investment, as well as the return of their invested principal."  ER/361-62.

As the government stated in its sentencing memorandum, Vahedi knew "many of the victims for several years before inducing them to invest with his investment company."  ER/52.  He "assured [them] that the investment opportunities were so great that he was putting millions of dollars of his own money into the projects."  ER/53.  "[I]n reality, there were no real estate development projects."  *Id.*  Instead, as the plea agreement stated, "Vahedi used money from other investors, or the investors' own principal, to make payments to investors that [he] falsely characterized as investment profits."  ER/362.  "[Vahedi] used a substantial portion of the money received from investors for his own personal benefit, including, among other things, to pay the monthly mortgages on several of his personal

properties, to make monthly lease payments for his luxury vehicles, to make monthly tuition payments for his son's private school, and to pay the expenses for his international concert production company, Concerto Production Corporation." ER/364.

As the government's sentencing memo stated, "[t]o make matters worse, when [Vahedi's investors] pleaded with [him] to return their money to them, he offered strained explanations for why could not return their money and in some cases blamed them for losing faith in him." ER/53. Vahedi's investors "were typical working families who in some cases had hoped to ease their financial pressures by refinancing their homes and investing the equity from their properties with defendant." ER/64.

To prevent existing investors from demanding the return of their funds or contacting law enforcement, Vahedi falsely told them that the Internal Revenue Service ("IRS") had frozen his funds as part of a government investigation into an $800 million bond deal that he claimed to have brokered between the governments of China, Malaysia, and South Korea. ER/365.

## C. Vahedi Pleads Guilty To Major Fraud Schemes And Is Sentenced To Eighteen Years In Federal Prison

According to the Complaint, "the FBI arrested Vahedi in early summer of 2012," ER/177, 469, and in November 2012, Vahedi pled guilty to making false statements to a bank in violation of 18 U.S.C. § 371, wire fraud in violation of 18 U.S.C. § 1343, and bank

fraud in violation of 18 U.S.C. § 1344. ER/52-53. (All unspecified references to the United States Code are to Title 18.) In December 2013, Vahedi was sentenced to eighteen years in federal prison and ordered to pay over $9 million in restitution. Ex. B to RJN.

### D. Plaintiffs File A 185-Page Complaint Alleging That The Bank Defendants Are Liable For Their Ponzi Scheme Losses

In October 2012, seventeen plaintiffs filed this action against the Bank Defendants and other named individuals, alleging ten causes of action arising out of the fraudulent schemes Vahedi had carried out against them. They asserted ten causes of action, including violations of RICO and the Real Estate Settlement Procedures Act ("RESPA") and eight pendant state law claims (violations of California's Unfair Competition Law ("UCL") and false advertising, negligent hiring, retention, supervision, and failure to warn, fraud and negligent misrepresentation, breach of fiduciary duty, elder abuse, violations of self-executing inalienable rights of property and privacy under the California Constitution, and identity theft). ER/435.

#### 1. Plaintiffs Allege That They Invested Millions Of Dollars In What Vahedi Described As No Risk, High Yield Investment Opportunities

The seventeen individual plaintiffs fall into three categories: (1) four are "borrower-investors," who claim they invested in Vahedi's Ponzi scheme with funds obtained from home loans through Bank Defendants; (2) five are "borrowers," who claim they obtained loans from the Bank Defendants but invested funds in

Vahedi's Ponzi scheme that were from other sources; and (3) eight are "non-borrowers," who invested in the Ponzi scheme but obtained no funds from the Bank Defendants.[2] ER/4, n.2.

### a. Borrower-Investor Plaintiffs

*Angeles and Juan Gomez*. The Gomezes met Vahedi in 1995 when he served as the mortgage broker for a Countrywide loan for their home. ER/204, 495. In 2004, the Gomezes applied to Countrywide for another loan and in response, Countrywide mailed them a "business-partner letter" identifying Vahedi as a business partner it "had 'carefully screened' and 'carefully selected.'" ER/471-72, 477, 496. Several days after receiving the loan application, however, Countrywide rejected it. ER/496. The Gomezes submitted a new application to Countrywide in July 2004 for $140,000, which was apparently granted, although the circumstances of that alleged transaction are unclear. ER/442, 477.

The Gomezes sold their home in 2006 and paid off the Countrywide loan. ER/205, 495-96. In December 2006, Angeles Gomez wrote Vahedi a check for $167,000, which Vahedi needed to fund various businesses. *Id*. As security, Vahedi gave the Gomezes an undated check for $167,000, telling them they could "cash it anytime, even tomorrow." ER205, 496. In 2007 and 2008, Vahedi "lulled [the Gomezes] into a false sense of security by timely paying

---

[2] Plaintiffs realleged verbatim in their FAC the allegations in their Complaint that are addressed in this section. See ER/204-80.

[them] the promised regular payments," sending them a check for $1,500 every 45 days (commonly known as "lulling payments"). *Id.*

In early 2008, Vahedi told the Gomezes he would submit a new home equity line of credit (HELOC) loan application to Countrywide on their behalf because "he wanted to get the cash-out proceeds so that he could invest them in a San Diego real-estate deal . . . ." ER/206, 496-97.[3] Vahedi applied to Countrywide for another loan on their behalf (the amount is unclear) and Countrywide mailed the Gomezes the business-partner letter a few days later. ER/477. Vahedi told the Gomezes when they signed the loan papers that they should not "'worry about reading them, as it is the same stuff,'" and told them where to sign. ER/206, 497.

In April 2008, Angeles Gomez wrote Vahedi another check for $179,000—more than the loan proceeds. *Id.* As security, Vahedi gave the Gomezes a $184,500 check—more than the loan proceeds since the Gomezes were doing the loan at his request and Vahedi had allegedly agreed to pay all closing costs. Vahedi told the Gomezes they could cash the check at any time, "even tomorrow." *Id.* Vahedi made lulling payments until late in 2008, when he stopped and

---

3    It is unclear from the Complaint whether Vahedi was applying, on behalf of the Gomezes, for a HELOC or "cash-out refinance" loan, the latter of which refinances the entire mortgage and gives the borrower an opportunity to borrow against the home's equity. *See, e.g.*, *Cash-Out Refi or Home Equity Loan*?, Mortgage Loan.com (Feb. 18, 2012) http://www.nasdaq.com/article/cashout-refi-or-home-equity-loan-cm121798 (last visited April 23, 2015) (explaining the difference between the two loan types).

began making excuses for his inability to return their money. ER/205-06, 497. Vahedi failed to repay the Gomezes a total of $351,000. ER/325.

Plaintiffs alleged that the Bank Defendants were liable under RICO for the Gomezes' losses because "Countrywide . . . and . . . Vahedi defrauded [them] out of over $351,000 by making false representations . . . [and] promis[ing] the Gomezes that if they would take out a Countrywide HELOC on their home, Kaveh Vahedi would take the cash out proceeds and give them a guaranteed return of principal and good monthly returns, promises that Kaveh Vahedi had no intention of performing." ER/84, 442-43.

*Vachik Alvandi.* Alvandi began working at Vahedi's concert company, Concerto Production Corp. ("Concerto"), in February 2006. ER/207, 498. Alvandi had heard that Kaveh Vahedi was a partner with Countrywide Financial, and a "super millionaire." *Id.* Vahedi pretended to take Alvandi into his confidence and regaled him with tales of his "room full of gold-bullion," his "beachfront villa in Spain that he said he was going to buy so that '[they could] vacation there together,'" and the "multi-million [dollar] commission" he had to go overseas to collect. ER/210, 500-01. By April 2007, Alvandi trusted Kaveh Vahedi completely and trusted that Vahedi would take good care of him. ER/211, 502.

Vahedi told Alvandi that if he "would provide the cash, he would let [him] in on [a] real-estate deal because . . . Alvandi had

helped . . . Vahedi build his concert company . . . and because . . . Vahedi loved [him] and trusted [him] like [he] trusted his own brother." *Id*. Alvandi drew down an existing line of credit on his World Savings HELOC and paid Vahedi $79,500 in cash proceeds, who gave Alvandi a $96,000 promissory note that was payable on demand on 15 days' notice and that provided for 2% every 30 to 35 days. ER/211-12, 502. Alvandi also gave Vahedi $16,500 from short-term loans he had received from his mother-in-law and sister. ER/212, 502-03.

Vahedi persuaded Alvandi to apply for "a bigger home-equity line of credit from Countrywide Bank on his home, up to 85% of the existing equity." ER/212, 503. Vahedi told Alvandi he "would not have to pay a penny for closing costs out of his own pocket" and that since he "knew people in Countrywide," he could "easily take the loan out" and all the monthly payments would be "easily affordable" because "Vahedi was guaranteeing [payments] out of his own money." *Id*. Without Alvandi's knowledge or consent, Vahedi submitted to Countrywide a loan application that stated "fraudulently inflated income" for Alvandi and that exaggerated how long Alvandi had worked at Concerto Production. ER/213-14, 504-05.

The Countrywide loan was approved and in June 2007, Vahedi presented Alvandi with the Countrywide HELOC loan documents. ER/214, 504. Knowing Alvandi was pressed for time, Vahedi told him to "'come here quick let's do this and go back, these

- 15 -

papers are due today . . . Just sign, I will take care of the rest.'" ER/213, 504.

Alvandi then loaned Vahedi $232,750, including the cash-out proceeds of the loan from Countrywide Bank. ER/214, 505. Vahedi told Alvandi that his monthly payments to Alvandi on the loan would "more than cover" the monthly payments. ER/215, 506. Vahedi "made dozens of lulling payments, followed by dozens of lulling emails." ER/216, 506.

Plaintiffs alleged that the Bank Defendants were liable under RICO for Alvandi's losses because Vahedi promised Alvandi that if he would take out a Countrywide HELOC, Vahedi would take the cash-out proceeds and give Alvandi a guaranteed return of principal and "good monthly returns"—promises Vahedi had no intention of performing, and that "[d]ue to the fraud of . . . Countrywide . . . and . . . Vahedi, including identity theft of Alvandi's personal information through fraudulent IRS Form W-2s," Alvandi lost the sums he advanced to Vahedi as well as more than $85,000 he paid to Countrywide Bank and KGV Investments in "inflated interest and fees." ER/85, 443.

*Evelin Raft*. David and Evelin Raft met Vahedi in 1997 when he brokered a mortgage loan for them. ER/224-25, 515.[4] In

---

4    The Rafts have since divorced and agreed that all claims relating to this suit would be assigned to Evelin, as part of their settlement. ER/526.

1999, Vahedi brokered another loan for the Rafts with Home Federal Mortgage Corporation. ER/225, 515-16. Vahedi presented himself to the Rafts as a "devoted and generous family man, who was very successful in many businesses and a friend of the Raft family, so that the Rafts would place their trust and confidence in him." ER/225, 516.

Between 2000 and 2007, Vahedi successfully brokered multiple loans for the Rafts by submitting false information—unbeknownst to them—including inflated income figures, fabricated W-2s, and forged documents; churning exorbitant fees for himself in the process. ER/225-30, 516-21. These loans included: (1) a $150,000 Countrywide-funded HELOC in February 2000; (2) a $215,400 Bank One-funded HELOC in July 2000; (3) a $376,900 CitiMortgage-funded mortgage loan in April 2004; (4) $176,200 Countrywide-funded HELOC in September 2004; and (5) a $437,000 Countrywide-funded HELOC in February 2007. *Id.* Vahedi promised the Rafts he would make the bulk of their Countrywide HELOC monthly payments, which he did between February 2007 and December 2008. ER/229, 520.

Plaintiffs alleged that the Bank Defendants violated RICO because Ms. Raft lost more than $305,000 in unearned loan fees, charges, interest, and cash-out loan proceeds that were entrusted to Vahedi in a short-term loan that he never intended to repay and in sums paid to Countrywide and its affiliates as a result of the alleged pattern of racketeering activities. ER/85-86, 444.

### b.    Borrower Plaintiffs

The borrower plaintiffs applied for home loans at various times with the Bank Defendants, but they did not allege that the funds they invested in the Ponzi scheme were home loan proceeds they received from the Bank Defendants or that their invested funds were otherwise traceable to the Bank Defendants.

***Douglas and Sharon Marks***. In September 2001, with Vahedi as their mortgage broker, the Markses obtained a $75,000 Countrywide-funded HELOC loan. ER/216, 507. To secure the loan, Vahedi submitted false loan applications that included fabricated W-2s, inflating the Markses' stated income. ER/217, 508. The borrower's "letter of explanation" in the loan file contained the Markses's forged signatures. *Id*. Then, again without their knowledge or consent, Vahedi submitted false and forged loan applications. ER/219, 509. In January 2004, they obtained a $150,000 Countrywide-funded HELOC cash-out loan from which they drew only $7,600 initially. ER/217-218, 508.

On March 27, 2007, Countrywide Bank FSB loaned the Markses $613,918 to pay off $150,000 Washington Mutual HELOC and withdraw the balance in cash. ER/221-22, 512. (The FAC does not disclose the circumstances of this alleged HELOC.) One month later, KGV Investments applied for a new $985,000 HELOC for the Markses with Washington Mutual, which was funded and closed three weeks later. ER/223, 513-14. By May 31, 2007, the two-month old

- 18 -

Countrywide HELOC was almost paid off.   ER/223, 514.  In the meantime, in late March 2007, Vahedi had emailed Sharon Marks, stating that their investment with him would include the cash proceeds of her Washington Mutual loan ($456,662.62), that that sum had been wired to her, and that she should rewire it to his Wells Fargo account, along with the $3,868.80 closing costs for which he was taking responsibility and the $100,000 previously advanced to him, for a total wire of $590,350.82.  ER/223, 514.  (The FAC does not disclose the details of the timing of the Washington Mutual loans or the Markses' alleged investment with Vahedi.)  Sharon Marks wired $456,662.62 to Vahedi that same day.  *Id.*  In early June, "Vahedi emailed [her] about a lulling deposit of $1,509.34 that he had made to her Wells Fargo account, signing it 'Love u always.'"  ER/224, 514.  Vahedi made lulling payments to the Markses through 2007 and then stopped. ER/224, 514-15.

Plaintiffs alleged that the Bank Defendants were liable under RICO for the Markses' loss of more than $980,000 in funds entrusted to Vahedi and funds paid to Countrywide Home Loans and its affiliates and to another bank.  ER/85, 443-44.

***Roberta and Ronald Barteck***.  The Bartecks met Vahedi through his parents and brother, who lived in the Bartecks' condominium building.  ER/235, 526.  Between 1996 and 2004, Vahedi brokered multiple mortgage loans for the Bartecks, including: (1) $197,250 funded by Countrywide in August 1996; (2) $197,150 funded by Amir Mortgage Corporation; (3) a loan funded by Broad

Street Mortgage Corp. in September 1997; (4) $196,000 funded by NationsBanc Mortgage Corporation in December 1997; (5) $196,100 funded by Broadstreet Mortgage Corporation in September 1997; (6) loans funded by Amir Mortgage in 1998 and 1999; (7) $192,700 funded by First Nationwide Mortgage Corporation in November 2001; (8) $192,500 funded by CitiMortgage in September 2003; and, (9) another CitiMortgage loan in February 2004. ER/236-39, 526-29. Vahedi obtained these loans by submitting false and fabricated information concerning the Bartecks' income. *Id.*

In April and May 2007, Vahedi offered the Bartecks "a no-risk proposition"—if they lent him $800,000 cash with his guarantee of repayment, he would purchase a commercial property in Dubai in a distress sale. ER/241, 532. The Bartecks liquidated $424,000 in equity from their condominium and wired it to Vahedi in May 2007. *Id.* In August 2007, Vahedi asked the Bartecks to increase the loan amount to $800,000, so he could invest that sum in the Dubai real-estate deal. *Id.* He guaranteed their investment was a short-term loan, payable on demand, and promised to make $20,000 in interest payments every 30-35 days under the Bartecks demanded return of their full $800,000. *Id.* The Bartecks provided Vahedi an additional $380,000 in August 2007. ER/242, 532.

Vahedi repaid the Bartecks $324,500, but stopped making payments in November 2008. ER/243, 533. In emails to them, Vahedi made excuses for his inability to repay until June 2010, when the Bartecks learned from Vahedi's brother that the remaining

$575,000 owing to them had been lost in a fraudulent scheme. ER/245, 325, 536. Plaintiffs did not allege any theory of liability as to why the Bank Defendants were liable for those losses. ER/444.

      ***Leesha Keller***.   Keller met Vahedi in 1998 when he brokered the refinance of her home. ER/258, 548. In 2007 and 2008, Keller loaned Vahedi $321,000. ER/260, 550. Vahedi made $64,200 in interest payments to Keller between March and October of 2008. ER/261-62, 551-52. Keller successfully sued Vahedi for breach of a promissory note and obtained a $347,215 judgment plus costs but has been unable to collect. ER/263, 553. Plaintiffs did not allege any theory of liability as to why the Bank Defendants were liable for the Keller's losses. ER/445-46.

### c.    Non-Borrower Plaintiffs

      None of the eight non-borrower plaintiffs alleged that they ever interacted with the Bank Defendants. And in their complaint, none alleged any theory of liability as to why the Bank Defendants were liable for the losses they allegedly sustained from Vahedi's fraudulent scheme. ER/445-47.

      ***Fred Shokoufi***.  In 2007, Vahedi asked Shokoufi to loan him money so he could expand his businesses. ER/246, 537. Shoukoufi agreed to seek a bank loan secured by his home so he could make the loan. *Id*. Vahedi submitted competing applications for home equity loans to Countrywide and Washington Mutual, using

fraudulent loan papers, without Shoukoufi's knowledge or consent. ER/247, 537. Washington Mutual approved and funded a $449,000 loan to Shoukoufi, which Shoukoufi loaned to Vahedi, and which Vahedi never repaid. ER/325, 547-48.

*Tadeh and Idet Keshmeshian*. In 2004 or 2005, the Keshmeshians met Vahedi, "who appeared to be a fabulously-wealthy individual with extensive business interests in the United States and overseas." ER/263, 553. Tadeh worked for Concerto and KGV Investments, "doing legitimate activities involving intellectual property and computers." ER/263-64, 554. In April 2007, Tadeh loaned Vahedi $50,000, which was never repaid. ER/266, 555.

*Celaris and Herayr Zahrabi*. Vahedi hired Celaris to teach Farsi to his son. ER/267, 557. In 2007 and 2008, Vahedi offered to help Herayr by "taking a short-term $15,000 loan payable with a good return" [ER/267, 557] and by using Vahedi's "international-financial contacts" to assist Herayr in transferring $100,000 from Herayr's father in Iran, who had sold his home and wished to send the money to his son in the U.S. [ER/268, 558]. The Zahrabis asked Vahedi to assist with the overseas transfer. *Id*. Instead of giving the money to the Zahrabis, Vahedi had the money deposited into his account and instructed them to lend it to him for a few months; in exchange he would pay them $2,000 a month in interest until the funds' "safe return." ER/269, 559. Vahedi never repaid the loan, which totaled $135,500. ER/325.

***Shawn and Shelly Reuveni***.   In 2004 and 2005, Vahedi hired Shawn to do painting contracting at his home.  ER/269, 559.  In 2007, the Reuvenis loaned Vahedi $50,000, which was never repaid. ER/275-76, 565-66.

***David Valentino***.   Valentino met Vahedi in 2005.   He worked for Vahedi and Concerto between 2005 and 2008, during which time Vahedi withheld more than $290,000 in payments due Valentino.  ER/276, 280, 566, 570.

## 2. Plaintiffs Allege RICO Claims Against The Bank Defendants

Plaintiffs' Complaint alleged that the Bank Defendants violated RICO, based on the following general allegations:

**Enterprise.** Plaintiffs alleged the Bank Defendants formed an enterprise with four of Vahedi's companies: (1) KGV Investments; (2) Concerto Production Company; (3) TransPacific Imports Group, LLC (vodka importing business); and (4) Mak Investments International, Inc. (a car leasing company in Irvine, California), and "this informal group of . . . companies . . . engaged in interstate and foreign commerce . . . [and that] Defendants, including Countrywide . . . participated in the operation or management of the enterprise." ER/447-48.

- 23 -

**Purpose and Object of Racketeering Activity.** Plaintiffs alleged that "[a] common purpose of the . . . [alleged] enterprise . . . was to prop up, vouch for, and fund Kaveh Vahedi so that the members of the enterprise could profit and make his fraudulent schemes successful." ER/449. The "promotion and assistance" took the form of "vouching for him (as Countrywide did on the internet and in mailings), and covering up his wrongdoing and his involvement in wrongdoing (as Countrywide . . . did in not 'blowing the whistle' on him . . . .)" ER/449-50. This allowed "the creation of a paper trail indicating that [Vahedi] was an honest, seemingly normal and legitimate, licensed, highly-successful, real-estate-entertainment-and-business entrepreneur who was generous, knowledgeable, and trustworthy." ER/450.

Plaintiffs further alleged that the Bank Defendants "sought to induce current and prospective borrowers into believing that [Countrywide] was looking out for their best interest through various types of solicitation," including "television, radio and print advertising, for example, claiming that it was a 'Company you could trust,' and urging consumer[s], applicants, and borrowers to 'join the millions of homeowners who have trusted Countrywide.'" ER/458.

**Racketeering Conspiracy.** Plaintiffs alleged that between 1999 and 2012, the Bank Defendants conspired with others to violate section 1962(c) by "conduct[ing] . . . the affairs of the . . . enterprise through a pattern of racketeering activity . . . ." ER/469.

**Pattern of Racketeering Activity.** Plaintiffs alleged the Bank Defendants committed the following predicate racketeering acts:

- False Mailings. Within three days of receipt of a loan application [ER/472], Countrywide Bank would mail "applicants for loans letters identifying as its 'business partner' . . . KGV Investments . . . and instruct . . . loan applicants to direct questions to its 'business partner' . . . [and send] a printed Countrywide Application Disclosure Handbook that falsely stated that Countrywide had 'carefully screened' and 'carefully selected' its business partners." ER/471. These mailings were allegedly false because "Countrywide did almost nothing to 'carefully screen' or 'carefully select' its business partners . . . ." *Id.* Plaintiffs Angeles and Juan Gomez [ER/477], Douglas and Sharon Marks [ER/473, 475], and Fred Shoukoufi [478] received these "false mailings." ER/472.

- Mail And Wire Fraud. Sending these allegedly "false mailings" constituted mail and wire fraud. ER/489-90.

- Advertisements. The Bank Defendants' monthly billing statements included ads encouraging customers "to fulfill their financial goals by taking out further loans" and "to consult with Countrywide's expert real-estate professionals to make their financial dreams come true." ER/478. "These advertisements primed some of the Plaintiffs . . . to be receptive to [Vahedi's] sales pitch . . . and [to believe] that he was so fabulously wealthy and such a

- 25 -

good businessman that he could be trusted with such large sums." *Id.*

- Turning A Blind Eye.  The Bank Defendants "purposely avoided and turned a blind eye toward learning the full details of [Vahedi's] dishonest dealings by . . . failing to attempt to interview or come into direct contact with its current and prospective borrowers. . . ." *Id*.

- Control Over Countrywide Website.  The Bank Defendants "conducted and directed the affairs of the enterprise" because they "maintained complete control over the wording of the Countrywide website, the Countrywide business-partner letter, the Countrywide Application Disclosure Handbooks," and other documents relating to the loan process.  ER/481.

Lastly, plaintiffs alleged generally that RICO's "statute of limitations" was tolled because: (1) "[w]hen [Vahedi] made the lulling payments, none of the Plaintiffs was represented by an attorney"; (2) "Vahedi [was] out of the country for over 12 months since October 1, 2008, and before his arrest by the FBI in summer 2012"; (3) "Vahedi made his fraud hard to detect with the assistance of his co-conspirators"; and (4) "Defendants concealed their fraud."  ER/571-72.

### 3. The Bank Defendants Move To Dismiss The Complaint For Failure To State A Claim

The Bank Defendants moved to dismiss the Complaint under Rule 12(b)(6) as to the borrower and non-borrower plaintiffs on the ground that they lacked Article III standing—i.e., there was no connection between their alleged injuries and the Bank Defendants' alleged conduct. SER/165-66, 170-71. The Bank Defendants also argued that plaintiffs' RICO claim failed because all lacked RICO standing, since they did not plausibly allege that the Bank Defendants' alleged predicate acts of racketeering were the direct cause of their investment losses. SER/178-83.

The Bank Defendants also maintained that the borrower-investor plaintiffs' claims were time-barred because they accrued on or before their loans closed, the last of which was March 2008, more than four years before plaintiffs sued in October 2012. SER/165-66, 172-73. The Bank Defendants also maintained that none of plaintiffs' tolling theories saved their claims. SER/173.[5] Finally, the Bank Defendants argued that plaintiffs failed to allege sufficient facts to support any of their remaining claims, which arose from their own investment choices, rather than from any of the Bank Defendants' conduct. SER/166.

---

[5] The Bank Defendants also argued that plaintiffs' RESPA claims were time-barred and not subject to equitable tolling. SER/172. The district court agreed and dismissed those claims as time-barred. ER/18. Plaintiffs did not re-allege their RESPA claims in their FAC [ER/99], and those claims are not at issue in this appeal. ER/99.

Plaintiffs opposed dismissal, claiming their lawsuit was "an outgrowth of four nationwide RICO class actions alleging a broad conspiracy between Countrywide and its business-partner brokers to defraud borrowers" and that "[f]or Countrywide, the 'chickens are coming home to roost.'" SER/124.

Plaintiffs argued that they had standing because their Complaint alleged that the Bank Defendants caused both the borrower and non-borrower plaintiffs' losses because they gave Vahedi an "aura of legitimacy, and provided the necessary funds to keep his Ponzi scheme afloat, thereby attracting more victims." SER/127-28. They also asserted standing based on their claim that the RICO violations caused their losses. SER/128-32. Plaintiffs further argued that the Bank Defendants were liable as fiduciaries because they did not act as a traditional lender and thus invited a fiduciary relationship with their borrowers. SER/143-48. Finally, plaintiffs argued that their delayed discovery of the fraud, the lulling payments, and the Bank Defendants' alleged fraudulent concealment, among other things, tolled RICO's four-year statute of limitations. SER/137-40.

The Bank Defendants pointed out in reply that (1) plaintiffs had failed meaningfully to address standing as to the non-borrower plaintiffs; (2) the Complaint contains material inconsistencies, such as alleging that Countrywide both was and was not a "lender"; and (3) none of plaintiffs' arguments remedied the defects in their RICO claim because plaintiffs did not allege that the Bank Defendants (i) committed a substantive RICO violation; (ii)

- 28 -

caused their injuries, by using racketeering income or otherwise; or (iii) knew of Vahedi's scheme. SER/95-102. The Bank Defendants reiterated their arguments that none of plaintiffs' tolling arguments was persuasive. SER/106-10.

### 4. The District Court Dismisses Plaintiffs' Complaint With Leave To Amend

The district court concluded that plaintiffs had failed to plead RICO standing because they "must plausibly allege that Countrywide's predicate acts of racketeering directly and proximately caused their investment losses in Vahedi's Ponzi scheme," and their allegations "that Countrywide committed predicate acts of mail and wire fraud, such as sending business partner letters during the loan application process falsely representing that Vahedi had been 'carefully screened,'" was "simply too attenuated." ER/20. (Because the standing and RICO arguments overlapped, the district court determined that it would be "better to analyze causation issues as a matter of RICO standing, which is more difficult to plead than Article III standing in any case." ER/19.)

The court pointed out that plaintiffs had alleged that "*Vahedi's* misrepresentations induced them to invest . . . [and] they do not allege that Countrywide knew or had reason to know about the Ponzi scheme or even that anyone was investing money with Vahedi." ER/20-21. The court noted that plaintiffs had not "allege[d] that Countrywide played any role in [Vahedi's] decision not to pay them

back." ER/21. The court further concluded that "[a]s to the Plaintiffs who did not even obtain a Countrywide loan, the chain of causation is even more attenuated." ER/20.

The court also rejected plaintiffs' unsupported standing arguments that the Bank Defendants caused their injuries by making Vahedi a "business partner" for mortgage brokerage purposes, thereby giving him an "'aura of legitimacy,'" and failing to "'unmask'" Vahedi as a fraudster, which caused the Ponzi scheme to continue "'as long as it did.'" ER/21. The court concluded that "the direct and proximate cause of Plaintiffs' investment losses was Vahedi's Ponzi scheme, not Countrywide's alleged predicate acts of mail and wire fraud." ER/21.

Although it was "skeptical that Plaintiffs [could] adequately plead that Countrywide directly and proximately caused their Ponzi scheme investment losses," the court gave plaintiffs leave to amend their § 1962(c) RICO claim. ER/23. As to § 1962(a), the court noted plaintiffs' brief argument that they had stated a claim, but concluded that "Plaintiffs have completely failed to allege or explain how any purported investment of racketeering proceeds in a legitimate enterprise distinctly injured them." ER/24. Thus, the court dismissed the § 1962(a) claim, but also with leave to amend. *Id.* Finally, the court dismissed plaintiffs' § 1962(d) RICO conspiracy claim, also with leave to amend, since "Plaintiffs . . . failed to plead that Countrywide . . . [was] aware or had reason to be aware of Vahedi's Ponzi scheme

- 30 -

or even that Plaintiffs were investing with Vahedi." ER/24-25. The court declined to rule on plaintiffs' state law claims. ER/25.

The district court "urge[d] Plaintiffs to use good judgment to decide whether they need federal claims against the [Bank] Defendants" in any amended complaint. ER/25. The court noted that "[f]undamentally," the case appeared to be a "simple fraud case," yet the 200-page complaint "strains to allege that Countrywide was actionably involved in Vahedi's Ponzi scheme." Thus, the court said, "[i]f Plaintiffs decline to amend the federal claims, we shall dismiss the state law claims without prejudice to refiling this action in state court pursuant to 28 U.S.C. § 1367(c)(3). If Plaintiffs decide to amend those claims on which leave to amend has been granted, Plaintiffs and their counsel are cautioned to comply with this order as well as Fed. R. Civ. Proc. 11. . . ." *Id.*

E.    **Plaintiffs File A 253-Page First Amended Complaint, Adding Fifty Pages Of "New" Allegations**

With utter disregard for the district court's admonition, plaintiffs filed a FAC, adding fifty pages of "new" allegations and arguments to their already lengthy Complaint, covering such wide-ranging topics as the history of the Bernard Madoff Ponzi scheme and reflections on the felony murder rule. ER/92-93, 117.

Plaintiffs abandoned their RESPA claim [ER/99] but added claims alleging "RICO 1962(a) and (b) liability from acquisition of an interest in, control, investment, establishment, and operation" of

a RICO enterprise. ER/141-43. In sum and substance, plaintiffs alleged that Vahedi used their funds to operate his businesses and was able to do so because of "the Countrywide imprimatur of Kaveh Vahedi being the Countrywide, the Nation's No. One Mortgage Lender's business partner . . . ." ER/141-42.

Plaintiffs attempted to draw a direct causal link between the Bank Defendants' alleged "wire and mail fraud" and Vahedi's Ponzi scheme by alleging a RICO enterprise theory consisting of a "mortgage fraud" component and a "Ponzi-scheme" component. ER/89-92. Their new theory of liability was that the Bank Defendants collaborated with Vahedi in the mortgage fraud component and "knew of or turned a blind eye to" the Ponzi scheme component. ER/90. To support this claim, plaintiffs relied on Vahedi's plea agreement wherein he pled guilty to mortgage fraud and investment fraud schemes. ER/356-66. But there, the Bank Defendants were among Vahedi's *victims* because Vahedi pled guilty to perpetrating mortgage fraud *against* the Bank Defendants and other lenders. *Id.*

Most of the "new" allegations in the FAC were mere variations of plaintiffs' already-rejected arguments that the Bank Defendants failed to "unmask" Vahedi's Ponzi scheme. ER/105, 116, 121-126, 140, 226 (alleging that the Bank Defendants missed "red flags" in borrowers' loan files); ER/90, 105, 109, 112, 123-24, 133, 147 (alleging that the Bank Defendants were "blind" to Vahedi's Ponzi scheme). Plaintiffs similarly alleged that the Bank Defendants did not obtain letters of explanation from borrower-investor and borrower

- 32 -

plaintiffs regarding the use of their home equity loans. ER/109-10. But elsewhere, they alleged that Vahedi *forged* letters of explanation in support of plaintiffs' loan applications. ER/188-89, 216-17, 226, 251-55.

Plaintiffs also attempted to remedy their failure to allege that the Bank Defendants knew about Vahedi's Ponzi scheme by alleging generally that "Countrywide probably had knowledge of the Ponzi scheme, and that it definitely should have known of the Ponzi scheme." ER/109. And they alleged the Bank Defendants were liable for their investment losses under RICO because the borrower-investor and borrower plaintiffs paid Vahedi and/or the Bank Defendants "'nickel and dime'" fees for underwriting services that were inadequately performed. ER/100.

They also argued that the Bank Defendants conspired with Vahedi to put those plaintiffs into loans they could not afford, with the intention of placing them on a "financial treadmill that could only be escaped with another loan brokered by the crooked broker, or in this case, by a Ponzi-loan scheme. . . ." ER/136-37. Finally, plaintiffs alleged generally that "special circumstances" existed to establish a fiduciary relationship with the Bank Defendants, but they offered no facts in addition to what they had alleged previously. ER/150-52.

### 1. The Bank Defendants Move To Dismiss Plaintiffs' FAC, Without Leave To Amend, For Failure To State A Claim

The Bank Defendants moved to dismiss plaintiffs' FAC for failure to state a claim under Rule 12(b)(6). SER/55-82. They argued that the FAC failed to state a RICO § 1962(c) claim because plaintiffs lacked RICO standing since they did not plausibly allege causation or reliance on any predicate act by the Bank Defendants in deciding to invest with Vahedi. SER/63-66.

The Bank Defendants also argued that they did not owe plaintiffs a fiduciary duty and that plaintiffs' allegations regarding the Bank Defendants' failure to "unmask" Vahedi were still insufficient to establish RICO standing. SER/66-68. The Bank Defendants also argued that plaintiffs failed plausibly to allege facts supporting their claim that the Bank Defendants were willfully blind to Vahedi's Ponzi scheme or had actual or constructive knowledge of it—such knowledge being required to establish association with the scheme. SER/74-75.

The Bank Defendants argued that plaintiffs' untenable multi-part RICO enterprise theory was no substitute for RICO standing and that plaintiffs had still not plausibly alleged the Bank Defendants' association with the purported RICO enterprise. SER/68-69. Plaintiffs' allegations that the Bank Defendants "probably" knew about Vahedi's Ponzi scheme were also implausible and contradictory. SER/71-72. The Bank Defendants also argued that the plaintiffs again failed to state a claim under § 1962(a) or § 1962(d). SER/76-77.

Plaintiffs countered generally that their FAC stated a RICO claim by alleging "RICO proximate cause" SER/39-42—i.e., that the Bank Defendants were part of the enterprise to commit fraud and joined Vahedi in his conspiracy SER/34-36, who acted in ways that were "atypical" of traditional lenders SER/42-51. Plaintiffs claimed their bare assertion that Vahedi was acting as the Bank Defendants' agent was sufficient to withstand dismissal because "agency is question of fact" and they "pled RICO § 1962(a) and (b) violations that proximately caused losses flowing from investment in and operation of racketeering-funded companies." SER/50-51. Plaintiff requested judicial notice of several documents, which the district court granted in part, noticing of Vahedi's plea agreements and the government's sentencing memo. ER/3.

In reply, the Bank Defendants argued that (1) plaintiffs had not alleged proximate cause because no predicate acts of the Bank Defendants led to the plaintiffs' injuries SER/5-6; (2) plaintiffs' "aura of legitimacy" arguments and agency theories did not create RICO standing SER/10-12; (3) plaintiffs had not pleaded facts showing that the Bank Defendants owed plaintiffs a duty SER/12-13, 18-21; (4) plaintiffs had failed to allege facts showing the Bank Defendants acted as a broker rather than lender or that they acted "atypically" as a lender SER/13-18; and (5) plaintiffs' claims failed under § 1962(a), (b) and (d) because they were insufficiently pled. SER/21-24.

### 2. The District Court Grants Defendants' Motion To Dismiss Plaintiffs' RICO Claims, With Prejudice, And Declines To Exercise Jurisdiction Over The Pendant State Claims

The district court applied the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009), and concluded that plaintiffs' FAC failed to state any RICO claims as to the Bank Defendants, as follows:

**§ 1962(a) Claim.** The court ruled that "Plaintiffs' FAC cure[d] none of the original Complaint's deficiencies [as] [t]he new § 1962(a) allegations merely detail how Vahedi invested racketeering proceeds to acquire various businesses." ER/6. "[T]hese allegations," the court said, "fail to explain how Plaintiffs suffered any distinct injuries from Vahedi's acquisition of these businesses. Nor could they, as all of their injuries flow directly from Vahedi's entrapping them in his mortgage-fraud and Ponzi scheme." *Id.*

**§ 1962(b) Claim.** The court ruled that "Plaintiffs' FAC contains a few conclusory allegations that purport to state a claim under § 1962(b), which prohibits the use of improper means to acquire an interest in an enterprise engaged in interstate commerce . . . [but that] Plaintiffs' conclusory allegation that 'Defendants gained an interest in and control of' the alleged RICO enterprise fails to state a § 1962(b) claim [because] . . . [n]ot only is [it] wholly bereft of factual support, but it also fails to allege that Defendants acquired this

purported interest in the RICO enterprise using racketeering means." *Id.* "Further, Plaintiffs fail to allege that they suffered any distinct injury from Defendants' purported acquisition of the RICO enterprise." *Id.* "And . . . they cannot make any such an allegation given that their injuries flow from Vahedi's fraudulent investment scheme." *Id.*

§ **1962(c) Claims.** The court ruled that "[a]lthough Plaintiffs' FAC adds over fifty pages of new allegations, none of these new allegations remedies the causation problem [the court] identified in [its] prior Order," or that change the fundamental causation analysis, *to wit*: the cause of plaintiffs' injuries is Vahedi's fraudulent misrepresentations, which induced plaintiffs to invest in his Ponzi scheme, and his decision not to repay plaintiffs' loans. ER/9. Vahedi's acts are entirely distinct from Countrywide's alleged predicate acts of mail fraud during the loan application process. Thus, the court concluded that plaintiffs lack RICO standing because the FAC did not plausibly allege that plaintiffs' losses were caused "'by reason of'" the Bank Defendants' conduct. ER/11.

The court found that the four borrower-investor plaintiffs obtained Countrywide loans expressly to carry out their already-made decision to invest in Vahedi's scheme. ER/7-8. The root cause of any damage flowing from these loans was thus plaintiffs' decisions to invest in Vahedi's scheme, and the FAC was devoid of any plausible allegations that Countrywide's business partner letters materially

- 37 -

contributed to those decisions. ER/10.6 Moreover, Countrywide sent plaintiffs the business partner letters *after* they submitted their loan applications, i.e., *after* they decided to obtain loan proceeds to invest in Vahedi's scheme, making it implausible that Countrywide's alleged mail frauds had any material effect on Plaintiffs' decision to invest. *Id*.

The court again rejected plaintiffs' allegations that Bank Defendants were liable for "turning a blind eye to Vahedi's Ponzi scheme" because Countrywide's failure to "'unmask'" Vahedi's Ponzi scheme was insufficient to establish RICO standing since Countrywide had no duty to protect borrowers from third parties' conduct. *Id*. The court also disagreed that Countrywide owed them a duty by acting "'atypically'" as a lender and "'actively participat[ing] in the financed enterprise,'" or by otherwise adopting a role "'beyond the domain of the usual money lender,'" because the FAC repeatedly alleged that

---

6 The court noted that "[t]he FAC is littered with accounts of the various tricks Vahedi used to entrap victims [such as using] . . . his own wealth to convince his victims he could get them 'generous returns' . . . [promising] 'a guarantee against risk of loss' and g[iving] his victims signed checks that he represented could be used to get their principal back." ER/9.

The court also noted out that Vahedi "made his victims think they were part of 'a select group' to which he was offering the investment opportunity . . . [and] had a longstanding or pre-existing relationship with his marks: he had done real estate work on behalf of the Gomezes since 1995; he employed Alvandi at his concert production company; he was a friend of the Markses and the Rafts; his brother and parents lived in the same condominium building as the Bartecks; and he did brokerage work for Keller in 1998 when he was a licensed broker with Amir Mortgage. *Id*. (citations omitted).

Vahedi (not Countrywide) acted as Plaintiffs' broker and that Countrywide had minimal direct contact with plaintiffs. *Id*.

The court also rejected plaintiffs' re-asserted argument that agency principles conferred RICO standing. ER/11. "While the existence of an agency relationship is a factual question, it does not relieve plaintiffs of the need to plead facts that support the conclusion that Vahedi was acting as Countrywide's agent in carrying out his Ponzi scheme" and the "conclusory labeling of Vahedi as Countrywide's agent is insufficient to allege an agency relationship, particularly given that a mortgage broker is generally an agent of the borrower, not the lender." *Id*.

Finally, the court ruled that plaintiffs' new RICO claim alleging that mortgage-fraud (rather than investment-fraud) was part of the alleged RICO enterprise was time-barred because plaintiffs filed their Complaint more than four years after the last of the plaintiffs' loans closed in March 2008. ER/8. The court also ruled that tolling did not save plaintiffs' claims because they failed to allege or establish that they were reasonably diligent in seeking loan documents that would have put them on notice of the fraud in their loan applications. *Id*.

**§ 1962(d) Claim.** The court ruled that the FAC's § 1962(d) conspiracy claim offered no plausible allegations that the Bank Defendants were "'aware of the essential nature and scope of the enterprise,'" which plainly included Vahedi's Ponzi scheme, or that

they "'intended to participate in it.'" ER/11. Plaintiffs' conclusory allegation that "'each Defendant had general knowledge of the conspiracy's general purpose to unlawfully enrich each other through fraudulent promises and representations,'" was insufficient to allege that the Bank Defendants conspired with Vahedi to carry out his Ponzi scheme. *Id.* Moreover, it was implausible that the Bank Defendants were involved with Vahedi's Ponzi scheme because when Vahedi funneled those loans into illegitimate investments, the Bank Defendants gained only borrowers who were unable to repay their loans. "To suggest that Countrywide would conspire in a scheme that inured to its own detriment simply flies in the face of common sense. In short, it is implausible that Countrywide would conspire to defraud itself." ER/12.

Although the court dismissed the state law claims without prejudice, the dismissal of the RICO claims was without leave to amend, on the ground that there was a "complete failure to even attempt to link their §§ 1962 (a) and (b) claims to . . . the Bank Defendants. . . . ER/5-6. Similarly, "[b]ecause Plaintiffs' bloated FAC did not remedy the RICO standing problem [the court] clearly identified in [its] prior Order, [the court] infer[red] that they have no allegations to satisfy this threshold prerequisite to pursuing their § 1962(c) claim and that any further leave to amend would be futile." ER/11. The court dismissed plaintiffs' § 1962(d) claims without leave to amend for the same reasons. ER/12.

The court entered judgment in favor of all defendants in December 2013, from which plaintiffs timely appealed.  ER/1, 2.

# V.

## STANDARD OF REVIEW

This Court reviews de novo the district court's judgment granting a motion to dismiss under Rule 12(b)(6).  *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995 (9th Cir. 2014).  In doing so, it construes all facts from the complaint in the light most favorable to plaintiffs, *Odom v. Microsoft Corp.*, 486 F.3d 541, 545 (9th Cir. 2007), but it does not accept as true legal conclusions "cast in the form of factual allegations," *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).  See also *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) ("to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief").

To survive a Rule 12(b)(6) claim, a complaint must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  A complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Id*. at 570; see also *Iqbal*, 556 U.S. at 678-79.  To plead facts sufficient under Rules 8(a) and 9(b) to support a plausible theory of RICO violations, a complaint must

contain adequate factual allegations plausibly to infer that defendants specifically intended to defraud. *Eclectic*, 751 F.3d at 994.

A RICO plaintiff's allegations must establish standing under § 1964(c), which means that a plaintiff must show that the defendant's RICO violation was a "but for" cause and the proximate cause of his injury. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462 (2006) ("a claim is cognizable under § 1964(c) only if the defendant's alleged violation proximately caused the plaintiff's injury"); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267-68 (1992). Thus, district courts should scrutinize proximate causation at the pleading stage and carefully evaluate whether the injury pled was proximately caused by the claimed RICO violations. *Anza*, 547 U.S. 461-62. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Id.* at 461.

The courts typically view civil RICO standing as a Rule 12(b)(6) question of stating an actionable claim, rather than as a 12(b)(1) question of subject matter jurisdiction. *See e.g., Oscar v. University Students Co–operative Ass'n*, 965 F.2d 783, 784–87 (9th Cir. 1992) (en banc) (addressing RICO injury requirement in § 1964(c) in context of reviewing dismissal under Rule 12(b)(6)); *Maio v. Aetna, Inc.*, 221 F.3d 472, 481 n.7 (3d Cir. 2000) (same).

This Court reviews the trial court's denial of leave to amend for an abuse of discretion. *United States v. Corinthian*

*Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). "The court considers five factors in assessing the propriety of leave to amend—bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." *Id.* Under the futility analysis, dismissal without leave to amend is proper where, upon de novo review, it is clear there are no new facts that could be added to cure a complaint's deficiencies. *Krainski v. Nev. ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 972 (9th Cir. 2010).

## VI.
## SUMMARY OF ARGUMENT

"RICO was intended to combat organized crime, not to provide a federal cause of action . . . to every tort plaintiff." *Oscar*, 965 F.2d at 786. As the district court correctly observed, this is not a RICO case, but "a simple fraud case" against individual defendants. ER/25. As such, plaintiffs have not alleged—because they cannot—facts giving rise to RICO standing to bring these RICO claims against the Bank Defendants.

This Court should affirm the district court's thorough and well-reasoned decision granting the Bank Defendants' motion to dismiss plaintiffs' FAC for failure to state a claim under Rule 12(b)(6). Even on de novo review, applying the pleading standards set forth in *Twombly*, 550 U.S. 544, *Iqbal*, 556 U.S. 662, *Holmes,* 503 U.S. 258, and *Anza,* 547 U.S. 451, plaintiffs did not state any RICO claims

- 43 -

against the Bank Defendants. Their allegations did not establish standing under § 1964(c)—i.e., they did not show that any alleged RICO violations proximately caused their injuries.

Plaintiffs also did not state a claim against the Bank Defendants under § 1962(a) because they failed to allege that they suffered any separate and distinct injuries that the Bank Defendants' alleged predicate acts of racketeering caused. All of plaintiffs' injuries flowed directly from Vahedi's luring them into his mortgage-fraud and Ponzi schemes, not from any racketeering conduct by the Bank Defendants.

Nor did plaintiffs state a claim against the Bank Defendants under § 1962(b). Their conclusory allegation that "Defendants gained an interest in and control of" the alleged RICO enterprise was unsupported by any factual allegations. Plaintiffs also did not allege that the Bank Defendants acquired this purported interest in the enterprise using racketeering means, or that they suffered a distinct injury from the Bank Defendants' acquisition thereof. Indeed, plaintiffs could not make such an allegation because Vahedi's fraudulent investment scheme, not any the Bank Defendants, caused their injuries.

On appeal, plaintiffs assert several new and novel theories as to why the Bank Defendants could be liable under § 1962(a) and (b), including a "dirty money" theory and a "concealment" money laundering theory. AOB/70-82. These arguments are not only

difficult to follow, they also do not appear to relate to any alleged predicate acts of racketeering *by the Bank Defendants*.

As noted, plaintiff's § 1962(c) claim failed because the FAC fails plausibly to allege causation, i.e., that the Bank Defendants' predicate acts of mail fraud and wire fraud directly caused their investment losses. None of their arguments on appeal undermines the district court's causation analysis, which correctly concluded that *Vahedi's* fraudulent misrepresentations induced plaintiffs into investing with him and that it was *his* decision to not repay their loans that caused their injuries.

The investor-borrower plaintiffs' claims that they suffered injuries as a result of the mortgage-fraud part of the alleged RICO enterprise were also time-barred. None of plaintiffs' tolling arguments is persuasive because they failed to allege that they were reasonably diligent in seeking loan documents, which would have put them on notice of the fraud in their loan applications.

Plaintiffs also did not state a § 1962(d) RICO conspiracy claim because they offered no plausible allegations that the Bank Defendants were aware of Vahedi's Ponzi scheme. Their conclusory allegation that the Bank Defendants "probably" knew or had general knowledge of the conspiracy is insufficient to allege fraud. Moreover, as the district court pointed out, it is highly implausible that the Bank Defendants were involved with Vahedi's Ponzi scheme because that

would mean the banks were conspiring to enter into loan agreements with borrowers who were unable to repay their loans.

Finally, the district court did not abuse its discretion when it refused to grant leave to amend. Plaintiffs failed to correct the deficiencies the court identified in its order dismissing their original Complaint, leading the court reasonably to conclude that a Second Amendment Complaint would be futile.

## VII.
## ARGUMENT

### A. Plaintiffs' FAC Failed To State A Claim For Violation Of RICO § 1962(a) or (b)

Section 1962(a) makes it unlawful for a person "to use or invest" income derived from a pattern of racketeering activity in an enterprise engaged in interstate commerce," while § 1962(b) prohibits the use of improper means to acquire an interest in an enterprise engaged in interstate commerce. To state a claim under § 1962(a), a plaintiff must state facts alleging that he or she suffered an injury arising from the defendant's use or investment of racketeering income, as opposed to injury from the predicate racketeering acts themselves. *Nugget Hydroelectric, L.P. v. Pac. Gas and Elec. Co.*, 981 F.2d 429, 437 (9th Cir. 1992) ("a plaintiff seeking civil damages for a violation of section 1962(a) must allege facts tending to show that he or she was injured by the use or investment of racketeering income."). As such, § 1962(a) "has been sparingly used because of the difficulty in

demonstrating that the investment injury was distinct from the injury caused by the predicate acts." J. Rakoff, RICO: Civil and Criminal Law Strategy § 1.06 (Lexis 2013).

Section 1962(b) prohibits the use of improper means to acquire an interest in an enterprise engaged in interstate commerce. To state a claim under this statute, a plaintiff must not only show that the defendant's conduct led to his control or acquisition of an enterprise, but also that this control or acquisition caused a distinct injury. *Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 830 (9th Cir. 2003), overruled on other grounds, *Odom*, 486 F.3d at 551 (en banc) (citing *Sebastian Int'l., Inc. v. Russolillo*, 186 F. Supp. 2d 1055, 1068 (C.D. Cal. 2000). Thus, "in addition to alleging facts sufficient to assert standing, [a plaintiff] must allege 'a specific nexus between the control of the enterprise and the racketeering activity.'" *Wagh*, 363 F.3d at 830 (quoting *Sea-Land Serv., Inc. v. Atl. Pac. Int'l*, 57 F. Supp. 2d 1048, 1055 (D. Haw. 1999)).

Plaintiffs' FAC failed to state facts that plausibly alleged claims under § 1962(a) or (b). First, the FAC failed to allege facts tending to show that the alleged RICO enterprise's "use or investment of racketeering income" injured plaintiffs. *Nugget*, 981 F.2d at 437. Plaintiffs alleged only that Vahedi invested racketeering proceeds to acquire new businesses; they never explained how they were "distinctly" injured by the acquisition of those businesses. ER/141-43.

- 47 -

Similarly, in support of their § 1962(b) claim, plaintiffs alleged generally and in summary fashion that "Defendants gained an interest in and control of" the alleged RICO enterprise. ER/142. Plaintiffs did not allege that the Bank Defendants acquired this purported interest in the RICO enterprise using racketeering means, that there was a nexus between the Bank Defendants' control of the enterprise and the racketeering activity, or that they suffered a distinct injury from the Bank Defendants' purported acquisition of an interest in the enterprise. *Wagh*, 363 F.3d at 830.

On appeal, plaintiffs raise several novel legal theories, which are difficult to discern and do not appear to have any bearing on their allegations as to the Bank Defendants' gaining an interest or control of the enterprise or the enterprise's use or investment of racketeering income. AOB/70-82. Plaintiffs include several color photographs and cite to inapposite case law, but these submissions neither cure the pleading deficiencies in the FAC nor undermine the district court's ruling that plaintiffs failed to allege the requisite § 1962(a) injury and that their FAC was "wholly bereft of factual support" of their § 1962(b) claim. ER/6.

**B. Plaintiffs Failed to State A § 1962(c) Claim Against The Bank Defendants Because They Did Not Plausibly Allege Facts Giving Rise To RICO Standing Under § 1964(c)**

Section 1962(c) provides that it is "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce[ ] to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." To state a claim for a RICO violation under § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985) (footnote omitted).

The RICO Act provides a private right of action to "[a]ny person injured in his business or property by reason of a violation" of RICO's substantive restrictions [§ 1964(c)], provided that the alleged violation was the proximate cause of the injury. *Holmes,* 503 U.S. at 268-69. Standing under section 1964(c) includes a causation requirement that encompasses factual and proximate causation, including as a "central element[ ]" a "direct relation between the injury asserted and the injurious conduct alleged." *Id.*; *see also Anza*, 547 U.S. at 461-62; *Hemi Group, LLC v. City of New York,* 559 U.S. 1, 12 (2010).

**1. Plaintiffs' Misplaced Trust In Vahedi And His Decision Not To Repay Their Loans Were The But-For And Proximate Causes Of Their Losses**

To meet the proximate cause requirement there must be "'some direct relation between the injury asserted and the injurious conduct alleged.'" *Rezner v. Bayerische Hypo–Und Vereinsbank AG*, 630 F.3d 866, 873 (9th Cir. 2010) (quoting *Holmes*, 503 U.S. at 268). This requires the court to examine the alleged RICO violation to determine if it led directly to plaintiffs' injuries. *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 982 (9th Cir. 2008).

The causation analysis here was not complicated because the FAC was replete with allegations making clear that that plaintiffs were all acquainted with Vahedi before they invested in the Ponzi scheme; many trusted him and considered him a friend; his misrepresentations about his successful businesses and his own personal wealth lured plaintiffs to loan him money; such that it was *Vahedi's* decision not to repay plaintiffs was the *direct* cause of their alleged injuries. *See* ER/4, 9 (citing allegations in the FAC); ER/204-35.

Despite these numerous clear and unmistakable facts, plaintiffs tried mightily to pin liability for their financial losses on the Bank Defendants by alleging that Vahedi was able to use their funds because of Vahedi's "Countrywide imprimatur . . . ." ER/142. They allege that Countrywide achieved this by committing a pattern of racketeering activity, the predicate acts of which were: (1) mailing "applicants for loans letters identifying as its 'business partner' . . . KGV Investments" and falsely stating that he had been "'carefully screened' and 'carefully selected'" as a business partner [ER/471], and that sending these alleged "false mailings" constituted mail and wire fraud [ER 489-90]; and, (2) turning "a blind eye toward learning the full details of [Vahedi's] dishonest dealings by . . . failing to attempt to interview or come into direct contact with its current and prospective borrowers." ER/478.

These allegations—even if true—*still* did not establish RICO standing because plaintiffs did not allege that these purported

acts by the Bank Defendants *directly* caused their injuries. *See Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1312 (9th Cir. 1992) (affirming Rule 12(b)(6) dismissal of RICO claims for lack of standing where subcontractor plaintiffs alleged that they lost profits due to defendant's unlawful pattern of mail fraud, bribery and extortion, through which it obtained contracts with prime contractors, because "[i]t was the intervening ability of the prime contractors to secure the contracts that was the direct cause of plaintiffs' injuries").

As plaintiffs admitted below, none received the purported "false mailings" from Countrywide until days *after* submitting a loan application to the bank. ER/179-80, 185. Thus, no plaintiff *could have* relied on any statements in the alleged "false mailings" when applying for their loans because any decision to apply for a loan was made *before* they received the purported "false mailings" from Countrywide. Moreover, of the seventeen plaintiffs in this case, only two borrower-investor plaintiffs—the Gomezes—received the "false mailings" from the Bank Defendants. ER/185.

Plaintiffs claim the district court erred when it distinguished this case from *Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200 (C.D. Cal. 2006) and *Benson v. JPMorgan Chase Bank, N.A.*, 2010 WL 1526394 (N.D. Cal. 2010), in concluding that plaintiffs lack standing. AOB/50. But the district court correctly found those cases inapposite and unsupportive of plaintiffs' standing argument. In *Gonzales,* "[p]laintiffs allege[d] that Lloyds was aware of the Ponzi scheme'" and that "'Lloyds was responsible for wiring

- 51 -

much of the commingled funds out of the accounts in aid of the Ponzi scheme," and thus the bank's alleged conduct *directly* assisted the perpetuation of the Ponzi scheme that injured the plaintiffs. *Gonzales*, 532 F. Supp. 2d at 1213. Here, as noted, plaintiffs did not allege that the Bank Defendants knew of or participated in Vahedi's Ponzi scheme. Rather, they alleged—at best—that Countrywide *indirectly* and *unwittingly* assisted Vahedi by accepting and funding mortgage loan applications submitted by him on behalf of his unsuspecting homeowner clients. *Benson* is equally inapposite because it does not involve RICO claims or RICO standing. *Benson,* 2010 WL 1526394 at *1.

Plaintiffs argue that "proximate cause" under RICO "is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case." AOB/45 (quoting *Holmes*, 503 U.S. at 272, n.20). They acknowledge that this Court has articulated a test, using three non-exhaustive factors, to determine whether the RICO proximate causation requirement has been met. AOB/45. The problem is that plaintiffs do not correctly apply the test. The two factors relevant here are "whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and . . . whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1147-48 (9th Cir. 2008) (citing *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1169 (9th Cir. 2002) (quotations and citation omitted)).

As *Sybersound* explained, attenuated harm that a plaintiff suffered does not meet the "directness" requirement laid down in *Holmes* for purposes of RICO standing because "'[o]ne motivating principle is the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action.'" *Sybersound*, 517 F.3d at 460 (quoting *Anza*, 547 U.S. at 458). "The element of proximate causation recognized in *Holmes* is meant to prevent," *Anza*, 547 U.S. at 460, the court from having "to engage in speculative and complicated analysis to determine what percentage of" plaintiffs' losses are attributable to a defendant's remote act, "instead to acts of . . . mail or wire fraud," *Sybersound*, 517 F.3d at 1148.

Here, not only did plaintiffs fail plausibly to allege a causal connection between the Bank Defendants and the funds thirteen of the seventeen plaintiffs in this case invested in the Ponzi scheme, they also failed to allege what percentage of damages, if any, the Bank Defendants were liable for as to those plaintiffs who purportedly received the "false mailings."

**2. The Bank Defendants Did Not Proximately Cause Plaintiffs' Injuries By Virtue Of Any Alleged Fiduciary Duty Because No Such Duty Existed**

"Mail and wire fraud can be premised on either a non-disclosure or an affirmative misrepresentation." *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015) (citing *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986)). However, "[a]bsent an independent duty, such as a fiduciary duty or an explicit

- 53 -

statutory duty, failure to disclose cannot be the basis of a [RICO] fraudulent scheme." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987).

Reasserting their "fiduciary duty" argument, plaintiffs contend that the Bank Defendants are liable for having "turned a blind eye" to the Ponzi scheme because they owed fiduciary duties to plaintiffs by virtue of  Countrywide having exceeded its role of a conventional lender by acting "atypically," i.e., as a mortgage broker. AOB/29-32.  They maintain the district court erred when it dismissed their claims because whether plaintiffs plausibly alleged a fiduciary relationship is a "*question of fact*."  AOB/33.

"The relevant question [in the duty analysis] is whether Countrywide *exceeded its role as a lender* by 'actively participat[ing] in the financed enterprise' or by otherwise adopting some role that is 'beyond the domain of the usual money lender.'"  ER/10 (citing *Nymark v. Heart Fed. Sav. & Loan Ass'n.*, 231 Cal. App. 3d 1089, 1092, 1096 (1991) ("a financial institution acting within the scope of its conventional activities as a lender of money owes no duty of care to a borrower").

Plaintiffs' own allegations in their FAC defeat their fiduciary duty argument because they asserted throughout that Vahedi, not the Bank Defendants, was the mortgage broker for the borrower-investor plaintiffs.  And Vahedi submitted loan applications on behalf of some plaintiffs to Countrywide Home Loans, as the lender.  *See*

ER/204-235. The FAC therefore lacked any plausible allegation that Countrywide acted as a mortgage broker, owed plaintiffs a fiduciary duty, or otherwise acted in a manner that transformed Countrywide's arm's-length loan transaction with plaintiffs into a fiduciary relationship. *See Oaks Mgmt. Corp. v. Superior Court*, 145 Cal. App. 4th 453, 466 (2006) ("absent special circumstances not present here a loan transaction is at arm[']s-length and there is no fiduciary relationship between the borrower and lender").

### 3. Equitable Tolling Does Not Apply To Save The Mortgage Fraud Claims From RICO's Four-Year Statute Of Limitations

Plaintiffs filed their Complaint in October 2012, more than four years after the last of the plaintiffs' loans closed, in March 2008. ER/678. Equitable tolling is unavailable in a pleading dispute unless the plaintiff pleads specific facts to justify application of the doctrine of equitable tolling. *Cas. Ins. Co. v. Rees Inv. Co.*, 14 Cal. App. 3d 716, 719-720 (1971) (when "apparent on the face of a pleading that the time limit of an applicable statute of limitations has run, in order to avoid the bar of the statute it is incumbent upon the pleader to state, *with particularity*, facts, rather than conclusions, which excuse his failure to learn of the fraud within the statutory period").

As the district court correctly determined, equitable tolling did not save plaintiffs' claims here because plaintiffs failed to allege that they were reasonably diligent in seeking loan documents, which

would have put them on notice of the fraud in their loan applications. ER/8. The only facts plaintiffs stated with particularity concerned borrower-investor Alvandi, who alleged that he attempted to obtain information concerning his loan from Bank of America on May 3, 2011, "but was rebuffed." ER/283. Plaintiffs did not state, however, why Alvandi—whose loan was funded in 2007 and who received no more than "some months of lulling payments" from Vahedi—waited until 2011 to start looking into his transactions with Vahedi. ER/214. Thus, plaintiffs' arguments that they were entitled to equitable tolling remain unpersuasive. AOB/82-88.

## C. Because The District Court Dismissed Plaintiffs' Underlying RICO Claims, It Properly Dismissed Plaintiffs' § 1962(d) RICO Conspiracy Claim

Section 1962(d) makes it unlawful for a person "to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." § 1962(d). "[A] person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act that is not an act of racketeering or otherwise unlawful under the statute." *Beck v. Prupis*, 529 U.S. 494, 507 (2000). Where a plaintiff "has not satisfied the pleading requirements of [§ 1962(a), (b), or (c)], he has also not alleged sufficient facts to state a claim under [§ 1962(d)]." *Wagh*, 363 F.3d at 830.

Because the district court correctly concluded that plaintiffs failed plausibly to allege that the Bank Defendants committed any overt acts of racketeering, it correctly dismissed plaintiffs'

§1962(d) RICO conspiracy claim. *Id.* Moreover, as the district court noted, plaintiffs' FAC did not plausibly allege that the "Bank Defendants were 'aware of the *essential* nature and scope of the enterprise,' which plainly included Vahedi's Ponzi scheme, or that they 'intended to participate in it.'" ER/11. As it observed, "[t]o suggest that Countrywide would conspire in a scheme that inured to its own detriment simply flies in the face of common sense." ER/12.

## D. The District Court Properly Dismissed Plaintiffs' RICO Claims Without Leave To Amend

Leave to amend is generally within the district court's discretion. *See, e.g., Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 853 (9th Cir. 2002). The discretion to deny leave to amend is particularly broad when the plaintiff has previously filed an amended complaint. *See, e.g., Chodos v. West Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002).

Here, the district court put plaintiffs on notice of the deficiencies in their RICO claims when it granted the Bank Defendants' motion to dismiss plaintiffs' initial Complaint. ER/13-26. Plaintiffs' failure in their FAC to remedy the deficiencies in their RICO claims led the court reasonably to conclude that plaintiffs could not cure those deficiencies with any plausible allegations such that further amendment would be futile. ER/6, 8, 11-12.

In their Opening Brief, plaintiffs recite the standard of review for denial of leave to amend, AOB/28, but they fail to argue

that they are entitled to further amendment except in their "Conclusion," where they state that "Plaintiffs seek leave to amend to allege facts reflected in their Request for Judicial Notice ['RJN']." AOB/88. Beyond referencing the exhibits attached to their RJN generally, plaintiffs have not articulated what facts, if any, they would allege that would cure the deficiencies in their FAC. This alone shows the district court did not abuse its discretion. *Corinthian Colleges*, 655 F.3d at 995.

## VIII.

## CONCLUSION

There was no basis to permit plaintiffs to move forward in this case. This Court should affirm the district court's judgment of dismissal in all respects.

DATED: April 28, 2015.

Respectfully submitted,

REED SMITH LLP

By        */s/ Paula M. Mitchell*
          Paula M. Mitchell

Attorneys for Defendants and Appellees Bank of America, N.A., et al.

## STATEMENT OF RELATED CASES
## (NINTH CIRCUIT RULE 28-2.6)

Defendants and Appellees Bank of America, N.A., et al. are not aware of any other cases pending before this Court that are related to this case.

DATED: April 28, 2015.

REED SMITH LLP

By _____ */s/ Paula M. Mitchell* _____
               Paula M. Mitchell

Attorneys for Defendants and Appellees Bank of America, N.A., et al.

## CERTIFICATION OF COMPLIANCE

1.     This Appellees' Answer Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,358 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This Appellees' Answer Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Office Word 2010 in 14 point Times New Roman.

Executed on April 28, 2015, at San Francisco, California.

_/s/ Paula M. Mitchell_
Paula M. Mitchell

## CERTIFICATE OF SERVICE

*Gomez v. Bank of America, et al.*
Ninth Cir. No. 14-55129

I hereby certify that I electronically filed the foregoing **APPELLEES' ANSWER BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 28, 2015.

I Certify that all participants in the case who are registered CM/ECF users will be accomplished by the appellate CM/ECF system.

Dated: April 28, 2015.

*/s/ Paula M. Mitchell*
Paula M. Mitchell